Final case for today is 2017-2248 FastShip v. United States Mr. Hogue, is it Hogue? Yes, ma'am. Mr. Hogue, please proceed. Thank you. I'd like to spend my time discussing why the LCS-3 should have been included in the loyalty base. Judge Liddell found that the impeller assembly had not undergone its final step of installation at the date of expiration. He found that the ship could not float at the date of expiration. He said that the degree of completeness was immaturity. He said that the LCS-3 at that date was not an operable assembly as a whole, citing Deep South. And that's simply not the law. The LCS-3 was ready for assembly on the date of expiration. It had no useful, non-infringing use, and that's a paper converting case of this court, and that should have authorized the inclusion of that ship in the royalty base. One of the primary issues here is the meaning of manufactured, as it's used in section 1498. Have you identified any alleged history informing our interpretation of manufactured? Can we go back to 1918 on this? No, we have not. I don't think the legislative history is all that helpful. At the time, in 1918, the definition of manufactured included to work as raw or partly raw materials into suitable forms for use. Several dictionaries have similar. Should we interpret manufactured in 1498 to require that the product be made suitable for use? I certainly don't see anything wrong with that, but what we have here is a patent expiration date case, and we ought to be giving the full force and effect of the patent extent period for that. If we're going to be in a paper converting situation where the competitor, or in this case the Navy, can assemble a patented item past the points of testing, and then the last year is gone. You have some arguments, but they don't seem really strongly supported about nefariously shipping parts to San Diego and so on. Obviously, a party could game the system, but you don't support that. Unfortunately, this motion was brought during written discovery, early in the case, and we were still in document production. The case developed, and we did find exactly that kind of evidence. We found subterfuge to hide the patent infringements, at least six of them. You can look at footnote 11 in Judge Leto's order, and you find a fraudulent model that was made by the Navy, tested to develop misleading low-pressure data near the transom stern, and they actually tried to use that data at trial until we called them on it. The picture shows the transom stern area convex instead of concave. That difference of one and a half inches translates to 18 inches on that ship, and that ship has a hooked stern that develops high pressure. We also had them try to do a CFD analysis at trial, where it was a computer simulation, and trying to say that the ship sunk. It turns out they didn't sample the right hull. It didn't have the hook. It didn't have the stern on it. Where does footnote 11 say fraud? It says it was wrong. I'm sorry? Footnote 11 says that the stern of the model didn't accurately represent the stern of LCS-1, but it doesn't say anything about fraud. Right, it doesn't. That's in the record where we went. There is no such thing as willful infringement in this case, and that's another thing. We didn't litigate that, but this is egregious misconduct typified by willfulness. They copied the patent. They lied to us at the early stage when we were still on the design team that they weren't going to use the patent. They told us that the design was originally going to be a speedboat named the Destriero and some Italian ferries. That was false. We were actually told in a letter from the Navy in the rejection letter that they had evidence that there was no high pressure under the hull and that there were simulations and tests to show that, and that was false. They didn't have any. All the data shows high pressure under that hull. We learned out later that the bow section, which arguably shouldn't be considered part of the claim, it's not in the claim, but he wanted to import that limitation into the claim to show that it hadn't been completed. That work on the bow had stopped in February and had progressed not one whit until after the patent expired. As we said, the nozzle assemblies were sitting dockside for two months waiting to be assembled. They were bolt-ins. There were eight hours of bolt-in, and it was done. The bow had about another week of welding because these were hand-welded, and that's basically it. They were slow up until the patent expiration date, and then it was open field running, building this thing. All these arguments, though, that this thing wasn't complete as of the date, those arguments were rejected in the Hughes aircraft case. Those thrusters were not coupled for receiving control signals. The thrusters were dummies for weight and balance determinations. The patent converting case was a situation where they were just assembly of parts were shipped offshore. Those are the two expiration date cases. We ought to be strengthening our patent system and not giving messages to patent infringers that they could just maintain their inventory in a disassembled state until the patent expiration date and then skate. That's not the situation here. The patented lifting stern was done. A pioneering lifting stern was completed, and it was miraculous. It violated the square cube law of Galileo. The Royal Navy, the U.S. Navy said it was impossible that it was going to do this, and that was done. That was the novel part of this, is the stern hull. That's why it should have been done. That makes no sense. Your position equates to, if you've built the novel part of my invention, you therefore have a complete assembly. There's no dispute that there were other claim limitations that hadn't been assembled or built at the time the patent expired. Under those circumstances, how did the court err? The operable assembly as a whole language of the Supreme Court in Deep South applies to combination patents, where the individual parts of the assembly are not patentable in and of themselves. It is only as a whole does it become a patented thing, and that's where that language came from. I understand where the language claim came from, but your argument that you just made a minute ago was they basically had already manufactured the novel part of our claims. Therefore, it's an operable assembly or a nearly complete operable assembly. I don't understand. There seems to be no dispute that at least one water jet limitation had not been assembled yet. There are power source limitations. It seems like there were other things, components of the claims, that had not been assembled that this was not operable at that time. I'm sorry, Your Honor, but the only thing that was not assembled was the nozzle assembly going in the water jet tunnel in the claim. The engines were there, the prop shafts were there. The hull was there? The hull was there, Your Honor. Hulls have bows, don't they? Well, you know what? That's true on ships, but this claim is much better read without bow in it. The claim says hull, right? The claim says hull. Yes, a vessel with a hull. It does say that. And so you wouldn't expect a court to read the word hull to exclude a bow, would you? I would. You would? I would. You would? Yes, Your Honor. A bow is not part of a hull. No, a bow is part of a hull. It's not part of this claim, though. This is an open claim. This has a list of features. I'm sorry? Let's assume that the propulsion was completed and you took it as built out to sea and you get it up to speed, would it float such that the bow would be unnecessary? Is that what you're saying? I am not saying that. I'm just saying that this is an open claim. And wherever you find that list of features, that's an infringement. And there's a whole lot of things, Your Honor, that make that ship go that isn't in this claim. There are decks and there are bulkheads and there's a bridge and there's rudders. The claim doesn't recite a bridge. I know. It recites a hull. It does. And a hull has to have a bow. Well, that's where we're going to disagree because I think you import that limitation into the claim to defeat this. But in any event, it was another week of welding and assembly to put the bow on. And that's pretty close. It's over 95% complete. Whether we follow the law of paper converting or not, or the law of Hughes Aircraft, there is no other patent expiration date case cited. But the Degraffenreid case is the only other one that the government cited, a claimed court case, and that was an infringement. And with the receiver stationed outside the country. Do you want to save time for rebuttal? I would like to. Thank you. Thank you, Mr. Walden. May it please the court. Why did the Navy drop fast ship from the design team? Your Honor, I don't think that has any relevance, but I don't believe it was the Navy that dropped fast ship from the design team. I believe it was Lockheed Martin that made that decision. Why was that? I'm not exactly sure, Your Honor. May it please the court. Fast ship seeks to expand paper converting beyond its specific facts, contradicting the Supreme Court's holdings in Deep South and in Warner Jenkinson. The trial court correctly rejected fast ship's argument, and it correctly held that the unassembled LCS3 could not have been manufactured within the scope of 28 USC 1498 before the patents expired. Judge Wallach, I know that you previously mentioned the... Yeah, I have the same questions for you. Certainly. Can you identify a binding case that interprets the term manufactured as it's used in 1498? I think you do have to look at the legislative history, Your Honor. Okay. That's the first thing you ask opposing counsel. Okay. So you have the 1910 Act, which did not include the word manufacture. And then there was the William Cramp case, which basically held this is a strict waiver of sovereign immunity. It doesn't include the word manufacture. And as a result, Congress came in and specifically waived sovereign immunity in 1918 to use the word manufacture. Now, as far as the specific definition of manufacture, I don't think there has been one. I think that the courts have traditionally treated it the same as make under 271A, which is essentially a complete assembly of the whole that's ready for use. And that is not present in this particular case under Deep South or under any of the other courts' precedents that always require a complete assembly of the whole. In paper converting, it seems to be a unique case where there was a scheme to avoid infringement, where there was an injunction against magnographics. Are you familiar with Zoltec? Yes, I am, Your Honor. Neither party nor the court federal claims seem to address it. That's correct, Your Honor. And I believe the reason is that— What does it teach us about the meaning of manufacture, if anything? I think the only thing that Zoltec teaches us with respect to the meaning of manufacture is that it has to include the definition of make under 271A, which I've already described. But as far as what Zoltec considered, Zoltec considered the meaning of use. And with respect to use, the court held that direct infringements covered by 271G could come within the meaning of use. But use is not at issue here. Sale is not at issue here. Sale's not under 1498. And use and sale were never alleged or argued by fascia. We're strictly talking about manufacture here. And when you're talking about manufacture, you have to look at what the Supreme Court said in Deep South and what this court has said in other cases like the Centillion data case where the court said that in order to have a manufacturer,  Fascia says that LCS3 was over 74% complete. And the Red Brief says LCS3 was 49% complete. How do we reconcile those conflicting— Does that 25% matter anyway? That dispute is not material, Your Honor, because what we really have to look at here is the claimed combination. Was the claimed combination complete? We can have an argument as far as what percentage, but I think the fact that everybody agrees that the claimed combination wasn't 100% complete makes it undisputed that there was no complete combination. But paper converting the device there wasn't 100% complete at the time of expiration, right? That's correct, Your Honor. So now we're, you know, under our controlling case law, we have to move off the notion of 100% completion, don't we? No, Your Honor. So no other cases seem to have ever followed paper converting. But even in paper converting, each— Did we just think of paper converting as a one-timer? I think it's best read as limited to its unique facts. And in paper converting, you had a sale, you had a scheme to avoid infringement, and you had each of the components were completely manufactured and tested, essentially, as a whole. Here, the hull was not a component that was complete, as you noted. It has no bow. The claim requires coupling between the inlet and the water jets and the power source. That wasn't complete either. So even if you use paper converting, this case is nowhere near paper converting as far as the— On May 18, the patent expires. That's correct. On September 17, the final module is welded into place and the vessel is complete. I actually believe that it's December before the grand bow module was completed, but yes, Your Honor, it was December several months after. Very convenient. I'm sorry. I think you're reading too much into the implication as far as, you know, when these very specific aspects of the components were completed. The ship wasn't even launched for several months after, and even at that time, the power source doesn't seem to have, you know, been connected or tested or anything else. I don't know exactly when the ship was manufactured, but I know that as of May 18, the ship was not manufactured, and the court correctly concluded that that was not a manufacturer that could be held liable. Both parties agree that there is one error in the way that the lower tribunal calculated damages. How exactly, if we were going to modify the awarded damage award, would we state the correct damage award? I believe it's in the briefs, Your Honor, but both sides have stipulated that if the court upholds the trial court's decision in all respects, then it's that 7.1 million number that the parties have stipulated to. As well as delay compensation? Correct. Is that right? Okay. Can we modify without a remand? I think you can remand with instructions to modify according to the parties' stipulation. Yeah, you say it should not necessitate, at page 80 in the red brief, you say that it should not necessitate a remand, and I can't figure out how to do it without a remand. I'm not an expert in court procedure, so I apologize if we've been unclear. If it requires a remand simply to state what the parties have stipulated to, then we're fine with that as well, too. If we were to do the modification right here at this level without a remand, could you give us a little more information as to just why it is that the agreed-upon number, which is different from Judge Leto's number, is the right number? What went into the adjustment? It's a minor adjustment, relatively speaking, but nevertheless it's a different number than the trial court below calculated. Right. So my understanding is that the court based the royalty base on the expected costs as of a particular date, and he cited a sheet that had the expected costs on it, but he actually cited the incorrect number for the expected costs. The wrong column, essentially. Yes, yes, exactly. If there are no further questions, let me turn to the government's cross-appeal in this action. In Liberty Ammunition, this court held that a term of degree fails to provide sufficient notice if it depends on the unpredictable vagaries of one person's opinion. The trial court correctly construed increases efficiency of the whole as a term of degree, but then when it applied the term of degree, it applied it in an indefinite way by relying on the opinion of Fatship's inventor. Now, the trial court clearly erred by letting Fatship satisfy its burden of proof using an attorney-created chart in its post-trial reply brief based on the unsupported testimony of its inventor 26 years after the patents were first filed. And the dispute boils down to whether Figure 11 is phrased in terms of kilowatts or whether it's phrased in terms of horsepower. There is no reference in the intrinsic record to kilowatts as a unit of power. In fact, the intrinsic record shows that power is uniformly referred to as horsepower. Can you show me where in the record you argued that Figure 11 is plotted in metric units rather than kilowatts? We have never argued that Figure 11 was plotted in metric units. We've always contested that Figure 11 was plotted in horsepower and imperial units, but that's been our position since claim construction. But the question is, why is it necessarily understood to be referring to imperial units rather than metric units? The term horsepower itself isn't exactly self-defining necessarily when it comes to what type of unit it's using. Well, there is such a thing as metric horsepower, Your Honor, which actually represents less power than an imperial horsepower. But I think the phrase horsepower in and of itself raises an implication that you're talking about imperial units, and especially once you read the specification. And in the specification, they talk about different water jets being rated in different horsepowers. There's never an indication that they're talking about kilowatts as a measure of power or shaft power. And you look at the different figures in the specification, and the different figures in the specification are phrased in terms of horsepower as well, too. So I think the overall implication of the intrinsic record is that these are imperial units of power. These are horsepower. And so to take one comment from trial that this could have been plotted in kilowatts, which represents a 34% increase of power, making a conventional hull appear much less efficient, and thus making LCS-1 appear infringing, was clearly erroneous. This is more of a common sense question. Why would a semi-planing monohull with water jet propulsion to lift the boat be less efficient than a conventional displacement hull? I mean, essentially, that's what you're arguing. Yes, Your Honor. A semi-planing monohull with these water jets to increase hydro lift is less efficient than your Garin variety displacement hull. Tom Waters, who testified at trial, he's the technical warrant holder for the Navy for surface ship hydrodynamics. I mean, isn't the whole point of a semi-planing monohull with this increased hydro lift designed to decrease drag and thereby increase efficiency? Well, Mr. Waters testified that he didn't actually view this as a semi-planing monohull, that it offended his sensibility as a hydrodynamics expert. But even putting that aside, this once again goes back to the all elements rule. I'm sorry, Your Honor. Are these vessels faster than their predecessors? Yes, I believe so. They use more fuel or less fuel? They use more fuel. And once again, if you turn to the testimony of Mr. Waters, he said that these vessels go fast because they have more horsepower than any other ship in the United States Navy other than aircraft carriers, essentially. That, to me, does not sound like an efficient vehicle. You're into your rebuttal time. Do you wish to save it? Yes, Your Honor. Thank you. Mr. Howell. Thank you. There's no scientist, naval architect, or physicist that subscribes to their theory on their graph. This ship did 43 knots in fresh water, meaning that that ship sits six inches deeper in fresh water. And if you plot 43 knots on their graph, the horsepower required to do 43 knots is over 140,000 horsepower. Their graph is absolutely 100% absurd. They never, ever, one time in the court contested the fact that figure 11 was in kilowatts. Figure 11 is in Volume 1, discussed in Volume 1. Well, in their pretrial brief, they obviously presented an illustration showing their conception of horsepower as referring to imperial units, not kilowatts. That's correct. Clearly, on the face of the figure, it doesn't say either way. But at a minimum, it was notifying you that their view of figure 11 is imperial units. That's correct. Okay. Absolutely, Your Honor. So it wasn't a surprise to you. No. We corrected that in trial. The inventor who created that graph, and it is a unique graph, testified that it's shaft horsepower in kilowatts. And that's on Volume 1 of the appendix, page 495, lines 16 through 18. Are we correct? That was never contested. Did the claims court expressly find that ship's expert and Mr. Guile's testimony to be more reliable? Yes. Right. Yes. It is. That's correct. That's all she wrote, as they say in the appellate world. Yes. Thank you. I have no further. Okay. He did not touch on the cross-appeal, so there is no rebuttal. The case is taken under submission. We thank court counsel for their arguments. All rise.